IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**DAMION LAFREDRICK PACE**                                              **PETITIONER**

V.                                                           CIVIL ACTION NO. 3:20-cv-287-DPJ-LGI

**JOE ARRINGTON**                                                          **RESPONDENT**

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Damion Pace seeks federal habeas relief under 28 U.S.C. § 2254. After a review of the entire record and all the applicable law, the undersigned recommends that his petition be dismissed with prejudice.

**Factual and Procedural Background**

In 2011, Pace was convicted of extortion, kidnapping, and robbery by a jury in the Circuit Court of Scott County, Mississippi. He was sentenced to twenty-year terms each on the robbery and kidnapping counts, and ten years on the extortion count, all of which to be served in the custody of the Mississippi Department of Corrections (MDOC). The relevant facts are accurately described in the state court's opinion and are incorporated here.

Jessica Goodwin provided most of the testimony against Pace. Goodwin testified that, on April 14, 2010, she was living in the rural Lake community in Scott County with her four-month-old daughter, Melissa,[1] and Melissa's father, who was not present that night. At about 10:00 or 10:15 p.m., Goodwin was preparing to bathe Melissa when she

---

[1] The name of the minor victim has been changed to protect her identity.

was startled by a masked man standing in the living room holding a gun.  The man had entered through the unlocked back door.  He demanded money and guns and, when Goodwin said she had none to give him, he forced her to rummage through her belongings.  Later, this man was identified as Darrin Wilson.  During the search, another masked and armed man, later identified as Devonte Hughes, appeared.  Hughes and Wilson searched the house for items to steal.  Then Wilson told Goodwin that she was coming with them.

   At gunpoint, Wilson and Hughes forced Goodwin, holding Melissa, out the back door and down the road, where a car was parked in the bushes.  Wilson instructed Goodwin to get in the back seat.  Then he got in the driver's seat while Hughes occupied the front passenger's seat.  They rode back to Goodwin's house and, as they were leaving, she saw Pace, whom she recognized as a former high school classmate, standing in front of her house.  Pace got into the back seat with her and slipped a mask over his face.  Goodwin testified that, as they drove away, Hughes said, "get the TV," but Wilson said "no" and kept driving.  As they turned down another road, Pace leaned forward and announced that he was ready to have sex.

      Then, Wilson asked Goodwin whether she could obtain money, and Goodwin said she thought she could ask her father.  Hughes, who had taken Goodwin's cell phone from the house, passed it to her, and she telephoned her stepmother.  Wilson told Goodwin to say that he wanted $2,000 and not to contact the police or he would kill her and her baby.  Goodwin testified that she complied, but she had trouble communicating because Melissa was crying loudly.  [Goodwin's stepmother] said that her stepdaughter was hysterical and

Melissa was crying so loudly that she could barely understand what her stepdaughter was saying, so she handed the phone to Goodwin's father, Tim Goodwin. Tim Goodwin put the speaker phone on, and he and [the stepmother] heard Jessica Goodwin say that the men wanted $2,000 or she and Melissa would be killed. Then, Wilson demanded the phone from Goodwin and told her to give Melissa to Pace and get out of the car. She complied. Tim Goodwin told Wilson that he did not have $2,000, so Wilson asked whether he wanted Goodwin and Melissa returned. Tim Goodwin told Wilson he had $500, and Wilson instructed him to put it in a paper bag and place it at the end of Good Hope Road. Tim Goodwin testified that he complied with this demand.

Jessica Goodwin testified that, when the call ended, Wilson exited the car and she asked him if she could hold Melissa, who was crying. Wilson allowed her to take Melissa from Pace. Then, Wilson began touching Goodwin and she said, "please don't do it." But Wilson forced her to turn around, pushed her against the car, and raped her at gunpoint as she held Melissa and the other two men watched. Then, Pace raped Goodwin against the car as she screamed, "please, no." Wilson then asked Hughes if he wanted to have sex with her, but he declined, so Wilson ordered Goodwin to pull up her pants and get in the car.

Jessica Goodwin testified that they all got back in the car and Wilson drove to Johnstontown Road, where he stopped and let Pace and Hughes out. Then, Wilson drove farther down the road to a trailer home, parked in the driveway, and exited the vehicle. Goodwin observed several people outside the trailer. Wilson was gone for five to ten minutes, during which Goodwin contemplated running away with Melissa, but decided it

3

was too dangerous because of the high probability that they would be captured again. When Wilson returned, he telephoned Jessica Goodwin's father, who said he had dropped off the money. Then, Wilson drove Goodwin and Melissa to the end of Good Hope Road, where he took possession of a brown paper bag with $500 inside.

After collecting the money, Wilson drove Jessica Goodwin and Melissa back to the residence on Johnstontown Road, then to a driveway that led to a pasture. He ordered Goodwin to get out of the car, at which point she exited the car with Melissa, and Hughes walked toward them from the woods. Then, Wilson walked away in the direction from which Hughes had arrived. Hughes told Goodwin that things had gone too far and that it wasn't supposed to be like this. He also said that Wilson had said he planned to kill them, but Hughes would not let that happen. A few minutes later, Wilson returned with Pace. Wilson held a plastic bottle filled with liquid and ordered Goodwin to use it as a douche. Goodwin testified that when she complied, the liquid burned her private area. Wilson also demanded Goodwin's underwear, which she gave him. Then, everyone got back into the car, and Wilson called Goodwin's father and told him where he could find Goodwin and Melissa. He dropped off Goodwin and her baby one road away from her home, and her father promptly picked them up. Goodwin's father drove them home, then her stepmother immediately took them to a hospital, where Goodwin underwent a sexual assault examination. Goodwin testified that her television set had been removed from her home.

The next day, Pace was arrested, and, on April 16, 2010, he gave a statement to Officers Billy Patrick and Willie Anderson of the Scott County Sheriff's Department. Pace said that he had stayed outside while Wilson and Hughes went into Goodwin's house. He heard a woman's screams coming from inside the house, then Wilson emerged from the house holding Goodwin and her baby at gunpoint. Hughes brought a television set and a video game console out of the house and secreted them on the roadside. Then, Wilson and Hughes got into the car and picked up Pace. Pace said that he whispered to Wilson and Hughes that he and Jessica Goodwin knew each other from school. Wilson parked in a pasture and called Goodwin's father to ask for money for the return of Goodwin and Melissa. Pace said that Wilson demanded $2,000 but "came down to" $1,000 and told Goodwin's father where to drop the money. Then, Wilson ordered Goodwin out of the car, and she handed Melissa to Pace, but when the baby did not stop crying, Pace returned her to Goodwin. Pace said that Wilson raped Goodwin as she held the baby, then "made me have sex with the lady also at gunpoint."

Pace said that they next drove to Johnstontown Road. Hughes and Pace exited the car and walked to Bridget Wilson's house, then Hughes borrowed a car from Pace's cousin and picked up the television set and video game console. When Hughes returned to Bridget Wilson's residence, Wilson, who had arrived at some point, said he planned to kill Jessica Goodwin. Resolved to prevent Wilson from killing her, Pace and Hughes got back into the car with Wilson and Goodwin. Wilson drove to a remote area and then Pace and Wilson left and obtained a bottle of vinegar from Wilson's mother's house. When they returned, Wilson ordered Goodwin to wash with it. When they got back into

5

the car, Pace told Wilson to drop Goodwin off, and Wilson called Goodwin's father and told him where he had left her.

Pace presented the testimony of several witnesses including himself. Kathryn Moyse was a forensic DNA analyst who had compared DNA from the vaginal swab from Goodwin's sexual assault kit with DNA from buccal (oral) swabs taken from Wilson, Hughes, and Pace. Moyse testified that a single source profile was obtained from semen on the vaginal swab, indicating that the semen on the swab was from a single person, and she had determined that this single source was Darrin Wilson.

Darrin Wilson, who was incarcerated for his crimes at the time of Pace's trial, testified that he had lived on Johnstontown Road all his life and had grown up with Pace. He testified that he and Jessica Goodwin had known each other for several months before that night and, in fact, sometimes met at in secret to do drugs together. He testified that, the night of April 14, 2010, he and Goodwin had concocted and executed a plan to extort money from her father with the object of buying crystal methamphetamine. He also testified that he had consensual sex with Goodwin that night, but that Pace never had sex with her. At some point, he went to Bridget Wilson's house and talked with Pace and Hughes. On cross-examination, he was asked about the baby, and he testified that Goodwin had the baby with her the entire time because she routinely brought the baby when they met to do drugs. He testified that Pace and Hughes had been with them for part of the night, but they had not known of the extortion plan. He denied that Hughes had taken Goodwin's television set or video game console. Wilson testified that, after he and Goodwin had gotten the money, Goodwin saw a car she thought was her boyfriend's

6

and demanded to be dropped off immediately.  Wilson also testified that he had been listening on an open cell phone line during Pace's police interview, and he never heard Pace confess.  Instead, he overheard the officers promise Pace that if he signed a prewritten statement, he could go home.

Pace testified in his own defense, and his testimony mirrored the version of events provided by Wilson.  Pace testified that he was eighteen years old on the night of the alleged crimes.  He said that he and Hughes had accompanied Wilson to a woman's house.  Wilson went inside and later emerged with Goodwin and her baby.  Then, they went to Bridget Wilson's house, where Wilson had left Hughes and Pace.  Pace testified that he never saw Wilson with a gun, and he denied that he, Pace, ever had sex with Goodwin.  Pace denied that Hughes had removed a television set or video game console from Goodwin's house.  He said he was not involved in the conversation with Goodwin's father about money.  And, Pace testified, he had never confessed, and that what purported to be his signed confession was instead a prewritten statement that the officers had coerced him to sign by holding a gun on him and promising that he could go home if he signed.

Pace's stepfather, Marcus Wilson, testified on behalf of Pace that he was present for Pace's interview with the police.  Marcus Wilson said that he urged Pace to tell the truth and listened as Pace gave his confession and witnessed the officer writing down what Pace said.  He testified that Darrin Wilson is his nephew.  He also testified that he lives about three miles away from Goodwin's house and that his niece, Bridget Wilson,

7

lives down the street.  Marcus Wilson testified that he was not home on the night of the crimes.  Marcus Wilson did testify that Pace asked for an attorney during his interview.

Bridget Wilson testified that Pace and Hughes came to her house that night and stayed about thirty or forty-five minutes, then departed together.  Lorenzo Pace testified that he saw Pace and Hughes at Bridget Wilson's house at about 9:00 or 10:00 p.m. on that night.  They stayed about thirty or forty-five minutes.  While they were there, Wilson came in, and shortly all three left together.  He saw Pace and Hughes again at about 1:00 or 2:00 a.m., when Hughes called and asked him to get them from Pace's mother's house.  Hughes's father, Lester Harper, also testified.

Upon hearing the evidence, the jury acquitted Pace of rape, but convicted him of extorsion, kidnapping, and robbery—a crime that had not been charged in the indictment.

## Discussion

Aggrieved, Pace appealed his conviction alleging trial errors and ineffective assistance of trial counsel, both of which were rejected by the Mississippi Supreme Court.  Even so, the court vacated the robbery conviction, finding plain error because robbery was not alleged in the indictment and the jury was not properly instructed as to that crime.  Later, Pace challenged the sufficiency of the indictment in post-conviction proceedings, alleging there were due process, doubly jeopardy, and subject matter jurisdiction implications.  The Mississippi Supreme Court found the arguments were not well taken, however, and denied his request for post-conviction relief, as well as his

subsequent motion for reconsideration.[2]  Pace now brings the instant petition and asserts the grounds below, which have been liberally construed and paraphrased for clarity:

> Ground One:  Sufficiency of the Indictment
>
>     a. Whether the trial court lacked subject matter jurisdiction for kidnapping[,] burglary[, and] extortion.
>     b. Failure of foreman of grand jury to sign indictment.
>     c. The indictment is fatally defective for failing to set forth the essential facts and elements of kidnapping.
>
> Ground Two:  Ineffective Assistance of Counsel
>
>     a. [In state post-conviction proceedings,] Petitioner's appellate counsel failed to forward Pace a copy of the State's response to Pace's pro se PCR motion, so Pace could not file a reply.
>     b. Counsel failed to investigate the sufficiency of the multi-count indictment.
>     c. Counsel failed to correspond with Pace.

**Procedurally Defaulted Claims**

To begin, save for his kidnapping claims challenging the sufficiency of the indictment, Respondent contends, and Pace does not dispute, that all remaining claims are foreclosed from federal review because they are unexhausted.  Applicants seeking federal habeas relief under § 2254 are required to exhaust all claims in state court prior to requesting federal collateral relief.  *Parr v. Quarterman*, 472 F.3d 245 (5th Cir. 2006). To satisfy the exhaustion requirement of § 2254(b)(1), a "habeas petitioner must have fairly presented the substance of his claim to the state courts." *Smith v. Dretke*, 422 F.3d 269, 276 (5th Cir. 2005). This requires submitting the factual and legal basis of every

---

[2] The record reflects that Pace styled the motion as a "Petition for an Order to Show Cause," but the Mississippi Supreme Court construed it as a motion for reconsideration of its order denying Petitioner's motion for post-conviction relief.

claim to the highest available state court for review. *Carter v. Estelle*, 677 F.2d 427, 443 (5th Cir. 1982). As the Supreme Court has recently observed, however, "[s]tate prisoners often fail to raise their federal claims in compliance with state procedures," or even fail to raise them in state court at all. *Shinn v. Ramirez*, 212 L. Ed. 2d 713, 142 S. Ct. 1718, 1732 (2022). "But to allow a state prisoner simply to ignore state procedure on the way to federal court would defeat the evident goal of the exhaustion rule. Thus, federal habeas courts must apply an important corollary to the exhaustion requirement: the doctrine of procedural default." *Id.* (internal citations and quotations marks omitted). The doctrine applies here, as any attempt by Pace to return to the state courts now to raise his unexhausted claims would likely be dismissed as a successive writ. *See* Miss. Code Ann. § 99-39-27(9). *Nelson v. Davis*, 952 F.3d 651, 662 (5th Cir. 2020); *Coleman v. Thompson*, 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991, *holding modified by Martinez v. Ryan*, 566 U.S. 1 (2012).

Pace can save his procedurally defaulted claims, however, if he can show both cause for the default and actual prejudice resulting from it, or if he can show that a "fundamental miscarriage of justice" will occur if his claims are not considered. *Coleman*, 501 U.S. at 750. To establish cause, "there must be something external to the petitioner, something that cannot fairly be attributed to him." *Coleman*, 501 U.S. at 753. To establish prejudice, a petitioner must show that, but for the alleged error, the outcome

of the proceeding would have been different. *Pickney v. Cain*, 337 F.3d 542 (5th Cir. 2003). Pace makes no attempt to show that either is met here.[3]

Similarly, he does not show that, as a factual matter, he is actually innocent of the crime for which he was convicted, or that he would suffer a fundamental miscarriage of justice if the defaulted claims were not considered. The "fundamental miscarriage of justice" exception is triggered only "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier,* 477 U.S. 478, 496 (1986). It requires that the petitioner support such an allegation with *new,* reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995). Pace has presented no new evidence here. Accordingly, he has failed to overcome his procedural default and the claims at issue are barred from federal review.

### Claim Reviewed on the Merits in State Court

Pace's remaining claim challenging the sufficiency of the indictment with regard to the kidnapping counts was adjudicated on the merits on post-conviction review.

---

[3] As to the failures to correspond and investigate in ground two, Pace does not specify which counsel was allegedly ineffective in this regard. To the extent that he asserts appellate counsel was at fault, ineffective assistance of counsel on direct appeal can constitute cause sufficient to overcome a procedural bar, but only if it has been raised and exhausted as an independent claim in state court. *Luna v. Davis*, 793 F. App'x 229, 233 (5th Cir. 2019); *Hatten v. Quarterman*, 570 F.3d 595, 605 (5th Cir. 2009). Pace did not so here. As for his claim that appellate counsel was allegedly ineffective for failing to provide him with a copy of the State's response to his motion for post-conviction relief, appellate counsel was not counsel of record in post-conviction proceedings, and was thus not responsible for providing Pace with a copy of the State's response to his motion as alleged in ground two.

AEDPA precludes this Court from granting Chism federal habeas corpus relief unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This court reviews questions of law as well as mixed questions of law and fact pursuant to 28 U.S.C. § 2254(d)(1) of the AEDPA, while questions of fact are reviewed under 28 U.S.C. § 2254(d)(2).

Under the first prong, the clauses "contrary to" and "unreasonable application of" are independent bases for granting federal habeas relief. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). A state court's decision is "contrary to" federal law if it contradicts Supreme Court precedent or reaches a different result on materially indistinguishable facts. *Id.* "[C]learly established Federal law includes only the holdings of the Court's decisions," *White v. Woodall*, 572 U.S. 415, 419, 134 S. Ct. 1697, 188 L. Ed. 2d 698 (2014) (internal citation and quotation marks omitted). Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court "correctly identifies the governing legal principle" but then "unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). The state court's decision must be objectively unreasonable, not merely erroneous or incorrect. *Wood v. Allen*, 558 U.S. 290, 301, 130 S. Ct. 841, 175 L. Ed. 2d 738 (2010).

AEDPA's second prong requires that federal courts defer to a state court's factual determinations unless they are based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Morales v. Thaler*, 714 F.3d 295, 301 (5th Cir. 2013). Deference is critical because federal courts have no authority to grant habeas corpus relief simply because "we conclude, in our independent judgment, that a state supreme court's application of [federal] law is erroneous or incorrect." *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002); *Jasper v. Thaler*, 466 F. App'x 429, 435 (5th Cir. 2012). Thus, we presume the state court's determination of a factual issue is correct, unless a petitioner rebuts the presumption with clear and convincing evidence. 28 U.S. C. § 2254 (e)(1). Applying these principles to Pace's only exhausted and remaining claim, the undersigned submits that he is not entitled to habeas relief.

As noted *supra*, Pace alleges in ground one that the indictment was fatally defective for failing to set forth the essential elements of kidnapping: that he (1) acted without lawful authority, (2) with or without the intent to confine secretly, (3) to forcibly seize and confine Goodwin and her baby. *Brent v. State*, 296 So. 3d 42, 48 (Miss. 2020) (citing Miss. Code. Ann. § 97-3-53 (Rev. 2014)). As a result, Pace claims his fundamental rights to a grand jury and due process, as well as the protections against double jeopardy and an illegal sentence, were all violated. The question of the sufficiency of his indictment, however, was considered and rejected by the Mississippi Supreme Court on post-conviction review, which found the argument was not well-taken. That finding precludes federal habeas corpus review. Indeed, "the sufficiency of a state

13

indictment is not a matter for federal habeas corpus relief *unless* it can be shown that the indictment is so defective that the convicting court had no jurisdiction." *Evans v. Cain*, 577 F.3d 620, 624 (5th Cir. 2009) (citation omitted). "[S]tate law dictates whether a state indictment is sufficient to confer a court with jurisdiction," *Williams v. Collins*, 16 F.3d 626, 637 (5th Cir. 1994) and where, as here, the highest court of a state has held—expressly or implicitly—that the indictment was sufficient under state law, federal review is foreclosed. *Coleman v. Taylor*, 49 F.3d 728 (5th Cir. 1995).

Even were our review not precluded, we would still have to accord "due deference to the state court's interpretations of its own law," and its implicit finding here that an indictment defect did not deprive the trial court of jurisdiction. *McKay v. Collins*, 12 F.3d 66, 69 (5th Cir. 1994). In this regard, counts two and three of the indictment charged that Pace "did willfully, unlawfully, feloniously and without lawful authority, and with or without intent to secretly confine, did forcibly seize and confine Jessica Goodwin [and her baby], contrary to and in violation of Section 97-5-53, Miss Code Ann. (1972)." Under the state's kidnapping statute, a kidnapping occurs if:

> Any person without lawful authority and with or without intent to secretly confine, shall forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be confined or imprisoned against his or her will, or without lawful authority shall forcibly seize, inveigle or kidnap any vulnerable person as defined in Section 43-47-5 or any child under the age of sixteen (16) years against the will of the parents or guardian or person having the lawful custody of the child . . . .

Miss Code Ann. § 97-3-53. As Respondent points out, although the indictment incorporates language from Miss Code Ann. § 97-3-53, it incorrectly cites Miss Code

14

Ann. § 97-5-53. Respondent notes that state law provides that "an indictment is sufficient despite citing the wrong statutory subsection so long as it contains a clear and concise statement of the elements of the crime charged." *Weeks v. King*, No. 3:15CV249 HTW-LRA, 2017 WL 6454440, at *6 (S.D. Miss. Nov. 13, 2017), *report and recommendation adopted,* No. 3:15-CV-249 HTW-LRA, 2017 WL 6454021 (S.D. Miss. Dec. 15, 2017) (quoting *Weeks v. State*, 123 So. 3d 373, 378–380 (Miss. 2013)).

Still, Pace argues that his indictment was defective, not because it failed to cite the correct statute, but because it did not include language that Goodwin was confined "against her will" or that her baby was a "child under the age of 16." Notably, Pace does not show that either are essential elements of kidnapping, *Brent*, 296 So. 3d at 48, or that omission of such language constituted a defect in his indictment per se. Consistent with federal law, Mississippi has recognized that "[t]he purpose of an indictment is to satisfy the constitutional requirement that a 'defendant be informed of the nature and cause of the accusation.'" *Taylor v. State*, 94 So. 3d 298, 305 (Miss. Ct. App. 2011) (quoting U.S. Const. amend. VI); *see* Miss. Const. art. 3, § 26; *See also United States v. Debrow*, 346 U.S. 374, 74 S. Ct. 113, 98 L. Ed. 92 (1953). "So long as a fair reading of the indictment, taken as a whole, clearly describes the nature and cause of the charge against the accused, the indictment is legally sufficient." *Farris v. State*, 764 So. 2d 411, 421 (Miss. 2000) (Miss. 2000) (citing *Harrison v. State*, 722 So. 2d 681, 687 (Miss. 1998)). Even when indictments are found defective, the error is harmless under state law where the defendant was on notice of the unlawful activity and provided the opportunity to prepare a defense.

*Quang Thanh Tran v. State*, 962 So. 2d 1237, 1246 (Miss. 2007) (citing *Arizona v. Fulminante*, 499 U.S. 279, 306, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)).

The undersigned submits that such was the case here. For four reasons, the omissions did not deprive Pace of notice of the crimes against him nor the opportunity to prepare a defense. One, a fair reading of the indictment, taken as whole, clearly describes the charges against him. Two, it should go without saying that a baby is clearly a "child under the age of 16." Three, the indictment not only tracks the statutory language in charging a forcible seizure and confinement, but Mississippi has long held that being forced to act under gunpoint constitutes a forcible seizure and confinement ***against one's will*** for purposes of kidnapping. *Brewer v. State*, 459 So. 2d 293, 296–97 (Miss. 1984). Four, while Pace's theory of the case was that his participation amounted to no more than being present during the commission of the crimes, the defense had ample notice, including his own confession, that the charges against him were based on aiding and abetting. *Pace v. State*, 242 So. 3d 107, 119 (Miss. 2018) **(**any person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an "aider and abettor" and is equally guilty with the principal offender).

In sum, by denying post-conviction relief, the Mississippi Supreme Court necessarily found that the indictment conferred jurisdiction, thereby foreclosing federal review. According the requisite due deference to the state court's decision, Pace has not shown that a defect in the indictment, or any other constitutional infirmity, entitles him to relief.

For all the reasons discussed herein, it is the recommendation of the undersigned United States Magistrate Judge that this habeas petition should be dismissed with prejudice.

## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Rule 72(a)(3) of the *Local Uniform Civil Rules of the United States District Courts for the Southern District of Mississippi*, any party may serve and file written objections within 14 days after being served with a copy of this Report and Recommendation. Within 7 days of the service of the objection, the opposing party must either serve and file a response or notify the District Judge that he or she does not intend to respond to the objection.

The parties are hereby notified that failure to file timely written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation, shall bar that party from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, except upon grounds of plain error. 28 U.S.C. § 636, Fed. R. Civ. P. 72(b) (as amended, effective December 1, 2009); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).

Respectfully submitted on July 31, 2023.

s/ LaKeysha Greer Isaac
UNITED STATES MAGISTRATE JUDGE
